IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WALTER N. D., IV,<br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | : | CIVIL ACTION<br><br>No. 23-cv-4701 |

**MEMORANDUM OPINION**

**CRAIG M. STRAW**
**United States Magistrate Judge**

**July 27, 2026**

Plaintiff Walter D. ("Plaintiff") seeks review of the Commissioner's decision denying his application for Supplemental Security Income ("SSI"). The parties consented to proceed before a Magistrate Judge,[1] and the matter was assigned to me. For the following reasons, I deny Plaintiff's request for review and affirm the Commissioner's decision denying benefits.

## I. PROCEDURAL HISTORY

On March 8, 2022, Plaintiff filed an application for SSI benefits and, on April 1, 2022, an application for child's insurance benefits.[2] R. 17, 82-83. Plaintiff's claim for SSI benefits was for the period of March 8, 2022, his application date, to September 19, 2023—the date of the ALJ decision. R. 17. Both claims were initially denied on September 8, 2022, and then again on reconsideration. R. 17, 91, 94, 96-98, 107, 116, 118, 123. Plaintiff filed a written request for a

[1] See Doc. 8; 28 U.S.C. § 636(c) & Fed. R. Civ. P. 73.
[2] Child's insurance benefits are permitted to "[e]very child . . . of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual" if certain criteria is met. See 42 U.S.C. § 402(d). Plaintiff's child insurance benefits claim ("CIB") for himself was made for the period from January 1, 2001, the alleged onset date ("AOD") to February 25, 2002, the date Plaintiff turned twenty-two. R. 17, 92; see 42 U.S.C. § 402(d).

hearing before an ALJ. R. 17, 159, 180.

On August 3, 2023, a telephone hearing took place before Administrative Law Judge (ALJ) Philip Healy because of the Covid-19 pandemic. R. 40, 42. Plaintiff testified at the hearing and appeared with his non-attorney representative, Annette Bandos. R. 17, 42. Vocational Expert (VE) Gina Baldwin also testified at the hearing. R. 17, 42.

The ALJ denied all requests for benefits.[3] R. 18, 34. Plaintiff sought review of the ALJ's decision with the Appeals Council, and the request was denied. R. 1, 222-23. Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. R. 1-2; 20 C.F.R. § 416.1481. Andrea Parente, Esquire, then filed this action for Plaintiff in federal court. Doc. 1. Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.[4] Doc. 14. Defendant filed a Response to Request for Review of Plaintiff. Doc. 15. Plaintiff filed a Reply Brief. Doc. 16.

## II. LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Commissioner employs a five-step sequential process to determine if a claimant is disabled that evaluates:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. If not, whether the claimant has a "severe impairment" that significantly

[3] The ALJ also decided not to reopen a prior February 7, 2019 ALJ decision denying Plaintiff's request for SSI benefits from 2015 to 2017 because Plaintiff had not shown good cause. R. 17, 68.

[4] Plaintiff does not raise in his brief any specific challenges to the denial of the CIB. Doc. 15, at 1. The claims he raises only relate to the denial of Plaintiff's SSI benefits. For these reasons, this opinion generally only refers to Section 416 except when the findings of the ALJ are discussed (which referred to Sections 404 and 416).

limits their physical or mental ability to perform basic work activities;

3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings," see 20 C.F.R. pt. 404, subpt. P, app. 1), which results in a presumption of disability;

4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform their past work; and

5. If the claimant cannot perform their past work, whether there is other work in the national economy that the claimant can perform based on the claimant's age, education, and work experience.

See Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to establish that the claimant can perform other jobs in the local and national economies based on their age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citation omitted).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" and must be "'more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Zirnsak, 777 F.3d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (explaining substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (additional citations omitted)). It is not a high threshold for evidence sufficiency. Biestek, 587 U.S. at 103.

## III. ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW

The ALJ determined that Plaintiff had not attained age twenty-two by the AOD of January 1, 2001. R. 20. Plaintiff had not engaged in any substantial gainful employment since the AOD. Id. The ALJ found that Plaintiff had the following severe impairments: 2013 cervical procedures, including C4-C7 anterior cervical discectomy, degenerative lumbar changes with spondylosis, depression, post-traumatic stress disorder ("PTSD"), and intermittent explosive disorder. R. 20; 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ decided that Plaintiff's impairments, either singly or in combination, did not meet or medically equal any of the Listings.[5] R. 20; 20 C.F.R. pt. 404, subpt. P, app. 1; see also 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; 416.920(d), 416.925 and 416.926. When the ALJ evaluated Plaintiff's mental impairments pursuant to the "paragraph B" criteria, the ALJ found that Plaintiff had a mild limitation understanding, remembering, or applying information. R. 21. Plaintiff had moderate limitations interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing oneself. R. 21-22. As a result, Plaintiff's mental impairments did not meet the "paragraph B" criteria.[6] R. 22. The ALJ also found the evidence did not meet the "paragraph C" criteria.[7] Id.

Considering the entire record, the ALJ found that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c), except he could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could frequently balance; could occasionally stoop, kneel, and crouch; never crawl; could occasionally overhead reach; could frequently reach otherwise, handle, finger and feel, push and pull, operate foot

---

[5] The ALJ specifically discussed Listings 1.15 (Disorders of the skeletal spine resulting in a compromise of a nerve root) 12.04 (Depressive, bipolar, and related disorders), 12.08 (Personality and impulse-control disorders), and 12.15 (Trauma- and stressor-related disorders) in his decision. See R. 20-21; 20 C.F.R. pt. 404, subpt. P, app. 1.
[6] See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E).
[7] See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(G)(2)(b)-(c).

controls; and could frequently work with humidity, wetness, and vibration. R. 23. Plaintiff could perform no work with dangerous moving machinery and unprotected heights, and no work with loud noise, defined as heavy traffic. Id. Finally, Plaintiff could understand, remember, and carry out simple, routine instructions, tasks, and decisions with occasional workplace changes, could have no interaction with the general public, no more than occasional interaction with co-workers and supervisors, and perform no work with production quotas or an assembly line pace. Id. The ALJ found that Plaintiff had no past relevant work. R. 32; 20 C.F.R. §§ 404.1565, 416.965. The ALJ found that there were other jobs in the national market Plaintiff could perform such as the unskilled jobs at medium exertional level of furniture finisher[8] with approximately 70,000 jobs nationally, a candy spreader[9] with approximately 40,000 jobs nationally, and a laundry laborer[10] with approximately 75,000 jobs nationally. R. 33. The VE represented these jobs accommodate the restrictions on Plaintiff's climbing, overhead reaching, interaction with specific others, and production quotas or an assembly line pace. Id. For these reasons, the ALJ determined that Plaintiff had not been under a disability from January 1, 2001 through the date of his decision. R. 34; 20 C.F.R. §§ 404.350(a)(5), 404.1520(g), 416.920(g).

In his request for review, Plaintiff argues the ALJ's RFC determination conflicts with the opinion of Steven M. Gordon, M.D., and precludes Plaintiff from performing competitive employment. Doc. 14, at 1, 4-10. Plaintiff also asserts that the jobs the VE proposed were obsolete (or required a production work rate),[11] a limitation the RFC prohibited. Id. at 1, 11-15

[8] See DOT # 709.687-014.
[9] See DOT # 520.687-022.
[10] See DOT # 361.687-018.
[11] Although the heading of the argument section includes the work production rate argument, the argument section itself does not address this assertion. Therefore, it appears Plaintiff waived this argument, and the Court does not analyze it in its opinion. See U.S. v. Pellulo, 399 F.3d 197, 222 (3d Cir. 2005).

The Commissioner claims that substantial evidence supports the RFC, and no error warrants remand. Doc. 15, at 7-12. Additionally, the Commissioner argues substantial evidence supports the finding that there are jobs in the national economy Plaintiff can perform. Id. at 12-14.

## IV. FACTUAL BACKGROUND[12]

Plaintiff was a "younger person" at the time of his AOD. R. 99, 108, 843; 20 C.F.R. § 416.963(c).[13] He has a high school degree. R. 98, 862.

### A. Medical evidence

After experiencing pain radiating to the left leg, Plaintiff had an MRI in October 2011 which showed a bilateral facet joint hypertrophy at L5-S1. R. 550. Plaintiff was admitted to Hahnemann University Hospital on March 28, 2013 due to cervical myelopathy and a Tylenol overdose. R. 25, 432. He was placed in the medical ICU and treated for liver failure. Id. at 432. After that treatment, he was transferred so orthopedics could consult regarding his persistent lower back pain. Id. It was determined that Plaintiff had significant cervical myelopathy, C2-C7. Id. Plaintiff underwent a C4-C7 Anterior Cervical Discectomy and Fusion, C3-T1 laminectomy, and a C3-T2 posterior spinal fusion without complications. Id. at 432-33. Plaintiff remained in the hospital until April 10, 2013. R. 432. He was then discharged and transferred to a prison rehab facility.[14] Id. at 433, 440. As of May 2013, he was doing well post-operatively and his sensory

[12] The facts section primarily focuses on evidence in the record of Plaintiff's mental impairments because the main issue Plaintiff raises in his brief concern his mental impairments. Doc. 14, at 1, 4-10. I also briefly discuss as background some of Plaintiff's physical impairments and his mental impairments prior to the period of benefits at issue.

[13] A younger person is under the age of 50, and it is not generally considered "that [claimant's] age will seriously affect [claimant's] ability to adjust to other work. However, in some circumstances . . . persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. § 416.963(c).

[14] Plaintiff last served time in prison from 2020 to 2021. R. 865. He was also on probation until 2025 with court-ordered mental health treatment and an order to stay away from his stepmother. Id. Plaintiff does not appear to seek SSI benefits here for a period of time when he was in prison. Id. at 17. If Plaintiff were in prison and was entitled to SSI benefits, generally he would not be

function and motor function were nearly normal. Id. at 578. In February 2014, Plaintiff continued to do well post-operatively and rehabilitation was recommended to get strength back in Plaintiff's upper extremities. Id. at 579.

In September 2015, Plaintiff reported neck pain with radiating pain to his buttocks had returned after a physical altercation. Id. at 599. An October 7, 2015 CT scan of Plaintiff's spine showed a mild left-sided disc bulge at C3-C4, but no hardware complications from his surgery. Id. at 353. Plaintiff also underwent an MRI of his brain which found atrophy of the inferior vermis and nonspecific scattered periventricular and subcortical T2 hyperintensities, which were atypical for his age unless he had risk factors. Id. at 359.

In October 2015 Community Council Health Systems ("CCHS") evaluated Plaintiff. Id. at 1062. Plaintiff recounted his long history of depression and intermittent explosive disorder. Id. at 1063. Plaintiff was adopted and grew up in a chaotic and sometimes violent family.[15] Id. He was diagnosed with major depressive disorder, recurrent, severe. Id. at 1064. Plaintiff agreed to take an SSRI he had not already taken, Effexor. Id. at 1063. Adult outpatient psychotherapy was recommended. Id. at 1064. After his initial CCHS appointment, he attended a few medication management appointments. Id. at 1060, 1062.

In April 2017, after being incarcerated again, Plaintiff reported back to CCHS and was diagnosed at that time with major depressive disorder, recurrent episode, severe, intermittent explosive disorder, and post-traumatic stress disorder, chronic. Id. at 1057, 1059. His "[l]ong history of mental illness and prison time" and "multiple medication trials" were mentioned. Id. at

---

eligible for SSI benefits for any month throughout which he was a resident of a public institution or prison. See 20 C.F.R. §§ 416.201, 416.211.

[15] Plaintiff reported his older sister's son molested Plaintiff from age three to eleven. R. 1067. Plaintiff was incarcerated from 2007 until May 2015 for solicitation to commit first degree murder after, in 2006, he hired someone to kill his stepmother after his adoptive mother died. Id. at 1065, 1068.

1059. He was deemed stable with his medication as of August 2017 at another CCHS appointment. Id. at 1046-47.

As of September 2018, X-rays of Plaintiff's lumbar spine were normal. Id. at 384. A March 2019 MRI without contrast of Plaintiff's lumber spine revealed degenerative spondylosis at L4-L5 and L5-S1 with minimal progression at L5-S1 since the prior exam and Plaintiff's cervical spine showed extensive postsurgical changes with anterior and posterior fusion, hardware and solid osseous fusion from C4 to C7, and malacic changes to C5/6 but no cord compression. Id. at 670. The MRI of the cervical spine also showed degenerative narrowing spondylosis at C2-C3 with moderate to severe right foraminal narrowing. Id.

Plaintiff went to CCHS again in January 2020 for the first time since September 2017, in part, because he was incarcerated beginning 2018 through February 2019 for a probation violation. Id. at 820. While in prison, he treated at JFK before returning to CCHS. Id. At CCHS, Plaintiff presented with complaints of depression, decreased appetite, and neurological pain from a beating he received while incarcerated in 2011. Id. His medications included Effexor, Buspirone, and Celexa. Id. It was recommended Plaintiff attend adult outpatient psychotherapy and continue medication management appointments. Id. at 822. In April 2020 at a telehealth visit with CCHS, Plaintiff reported increasing sadness because of pain, so his Cymbalta dosage was increased. Id. at 835. Plaintiff was stable at his June, July, and August 2020 CCHS telehealth visits. Id. at 1018, 1021, 1024.

David B. Klebanoff, M.D., conducted an internal consultative medicine examination of Plaintiff for the Social Security Administration on June 24, 2020. Id. at 843-47. Plaintiff reported having long-standing mental health issues and being under the care of the mental health counseling community. Id. at 843. Plaintiff also noted that, at times, his left lower extremity went numb. Id.

At the time of the exam, Plaintiff was living in a rooming house with three other people. Id. at 844. He could do light cooking, cleaning, laundry, and shopping with assistance as needed. Id. Plaintiff could also shower and bathe himself, dress himself, read, and go online. Id. Plaintiff was remarkable for a slow, shuffling gait, and somewhat dragged his lower left extremity when he rose from the chair and walked across the room, but did not use an assistive device. Id. at 845. He was also remarkable for weakness proximally and distally in all extremities at 4/5. Id. at 846. Otherwise, Plaintiff's physical exam was normal. Id. at 844-46. Plaintiff is a smoker and a social drinker. Id. at 844. His diagnoses were neck pain, status post cervical fusion, bilateral upper and lower extremity weakness, mental health issues, and nicotine abuse with a fair prognosis. Id. at 846.

In October 2021, Plaintiff attended an in-person mental status exam with Elwyn. Id. at 26; 876. He was cooperative, but somewhat guarded. Id. at 876. Plaintiff presented with depressive episodes and past trauma with PTSD symptomology. Id. His mini mental exam score was within normal range. Id.

Plaintiff participated in a court mandated 60-minute telehealth psychiatric exam on October 28, 2021. Id. at 881. Plaintiff had just been released from prison. Id. at 882. He said he had waves of anger and had been extremely depressed for months. Id. He also had sleeping problems, nightmares, and flashbacks. Id. Plaintiff also had suicidal ideations, and passible homicidal ideations in the past. Id. He has taken Cymbalta, Celexa, Prozac, and Zoloft, but none of those medications effectively managed his symptoms or treated his chronic pain related to nerve damage from his back surgery. Id. Celexa, however, had been effective in the past managing his depression and PTSD. Id. Plaintiff was offered a prescription for Prazosin to manage nightmares, however, Plaintiff declined. Id.

Also in October 2021, Plaintiff began weekly telehealth psychotherapy and medication management appointments. Id. at 883-938. While he attended some of them over a period of time until November 2022, he also did not answer calls at the time of his therapy appointments on many occasions. Id. at 885, 887-88, 892, 895-98, 907, 910, 914, 916-17, 919, 926, 928, 931, 935-36, 938, 949, 951-52, 956, 959-62, 971, 974, 978, 980-81, 983, 988, 990, 992, 995, 999, 1002. In therapy, Plaintiff worked on psycho-social factors affecting him, discussed his incarceration, his unemployment, and applying for jobs, among other things. Id. at 880, 884, 886, 889, 890-91, 893-94, 899.

Of note from these appointments, in January 2022, Plaintiff reported feeling down after Amazon rejected him for a job in their warehouse because of his legal history. Id. at 893. His prescription for Celexa was increased and at the next visit labs were going to be taken with a plan for him to take Depakote. Id. At his January 2022 appointment, Plaintiff said he was thinking about hospitalizing himself because he was having difficulty getting out of bed, felt depressed, and had suicidal ideas. Id. at 900. Three days later, the therapist checked, and Plaintiff said he was feeling "significantly better" after stopping Celexa. Id. at 901. Plaintiff had applied for seventy (70) jobs that weekend. Id. At the end of January 2022, Plaintiff said he was feeling "edgy," but better than before, and continued with efforts to try to obtain employment. Id. at 902. He continued searching for a job in March 2022, played chess to cope, and was not as hypervigilant as before when walking around in public. Id. at 911, 915, 918. Plaintiff complained about his nerve and back pain. Id. at 911-13, 915, 918. In May 2022, Plaintiff declined a mood stabilizer. Id. at 922. Plaintiff stopped attending individual therapy sessions in July 2022. Id. at 930-31.

At a July 2022 medication management appointment, Plaintiff reported Effexor medication had helped but after he had run out of it because of a missed appointment he did not take it and felt

more depressed. Id. at 929. Plaintiff reported an uptick in "body pain" and feelings of depression and rage accompanied by flashbacks at another end of July 2022 appointment. Id. at 930. At an August 2022 medication management appointment, Plaintiff reported that his mother had recently filed a Protection Against Abuse ("PFA") order against him based on a threatening voicemail message (he claimed was not him), was depressed because of his living situation and lack of finances, and that an Effexor increase had not helped. Id. at 932. Abilify was added to his medications. Id. In September 2022, Plaintiff reported his depression and sleep improved by taking Abilify so his dose was increased, but he had continued agitation. Id. at 933. Plaintiff applied for SSI benefits because of his inability to find work. Id. At October 2022 appointments, Plaintiff reported his depression as "somewhat better," a continued conflict with his landlord, frustration with his SSI application being denied, and periodic thoughts wanting to be dead without a specific plan or intent. Id. at 934, 937. Plaintiff was directed in October 2022 to complete baseline bloodwork with a plan to start a trial of Depakote. Id. at 937.

At the state agency's request, Elisabeth N. Gibbings, Psy.D., performed a mental health status examination of Plaintiff on August 30, 2022. Id. at 862. Plaintiff reported a history of psychiatric hospitalizations as a child and in 2013 and 2021 following overdoses with Tylenol. Id. at 862-63. He also had several placements in special units both in state and city correctional institutions. Id. at 863. Plaintiff participated in court-ordered outpatient mental health treatment at Elwyn and saw a therapist on a weekly basis and a nurse practitioner on a monthly-basis since 2020. Id.

Plaintiff frequently awoke with nightmares, experienced loss of appetite and a twenty (20) pound weight loss in just a few months, with his last suicidal ideation in 2021. Id. He had homicidal ideation toward his stepmother and a court order to stay away from her. Id. at 864.

Plaintiff is quick to anger, startles easily, and has verbal altercations with those he views as threatening. Id. Additionally, he has difficulty concentrating and learning new material. Id. Plaintiff can organize himself and develop a plan to accomplish simple tasks. Id. He had been arrested on reckless endangerment, aggravated assault, and criminal solicitation of murder. Id. at 864-65. Plaintiff last served time from 2020 to 2021. Id. at 865.

On exam, Plaintiff was cooperative, intelligible and fluent, and coherent and goal-oriented. Id. His affect was flat, and he reported feeling "sad but raging underneath" today. Id. Plaintiff's insight and judgment were poor. Id. at 866. Plaintiff had the capacity to bathe, groom and dress himself, but had decreased attention to self-care. Id. He was able to clean, do laundry, go shopping, and prepare simple meals. Id. Plaintiff can take public transportation, manage his own money, play chess online, and had a good relationship with his father. Id. He avoided interacting with friends. Id. Dr. Gibbings diagnosed Plaintiff with major depressive disorder, recurrent, moderate with psychotic features, schizoaffective disorder, depressive type provisional PTSD, and intermittent depressive disorder by history. Id. It was recommended Plaintiff continue with mental health treatment as currently provided. Id.

A Medical Source Statement of Ability to Work Related Activities (Mental) ("MSS") from Dr. Gibbings completed on August 30, 2022, indicated that Plaintiff had mild limitations understanding and remembering simple instructions and carrying out simple instructions. Id. at 868. He also had a mild limitation making judgments on simple work-related decisions. Id. Dr. Gibbings opined Plaintiff had moderate limitations carrying out complex instructions and, in the ability to make judgments on complex work-related decisions. Id. She found Plaintiff had marked limitations interacting appropriately with the public, moderate limitations interacting appropriately with supervisors and co-workers, and mild limitations responding appropriately to usual work

situations and changes in a routine work setting. Id. at 869.

In September 2022, Molly Haas Cowan, Psy. D., indicated in her Disability Determination Explanation ("DDE") that Plaintiff had mild limitations understanding and remembering simple instructions, carrying out simple instructions, and responding appropriately to usual work situations and changes in work settings. Id. at 87. Plaintiff had moderate limitations understanding and remembering complex instructions, carrying out complex instructions, in his ability to make judgments on complex work-related decisions, and interacting appropriately with supervisors and co-workers. Id. at 88. Finally, Dr. Cowan found Plaintiff had a marked limitation interacting appropriately with the public. Id. She also opined he can perform one- or two-step, routine tasks in a stable environment. Id. at 89. He also could maintain regular attendance and be punctual. Id. Several months later, at the reconsideration level, Arlene I. Rattan, Ph.D., affirmed Dr. Cowan's assessment in a DDE issued February 1, 2023. Id. at 32, 111. Dr. Rattan found that Plaintiff had mild limitations understanding, remembering, and applying information and moderate limitations interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing oneself. Id. at 111-12.

On November 22, 2022, Plaintiff returned to CCHS for treatment and saw Steven Gordon, M.D., for a telehealth visit. Id. at 1015. Plaintiff's primary care physician ("PCP") had been prescribing Plaintiff Effexor and Abilify with some benefit, and Plaintiff wanted to restart therapy at CCHS. Id. Plaintiff said he was anxious and depressed daily, and if he is triggered, he can be explosive and break things in his home. Id. He also admitted to chronic suicidal thoughts, a lack of appetite, and that he lost fifteen to twenty pounds in the prior few months. Id. Plaintiff also had nightmares and flashbacks on a regular basis. Id. During the exam Plaintiff was cooperative, oriented (times three), had good cognition/memory, related well with neutral mood, normal speech,

no evidence of psychosis, no delusions, and no hallucinations. Id. at 1016-17. Plaintiff was directed to continue his current medication plan (he was not interested in altering his regimen) with his PCP prescribing his medications and to start therapy. Id. at 1017.

At a January 4, 2023 telehealth medical management visit with Dr. Gordon, Plaintiff reported being angry and depressed recently. Id. at 1011. He was more irritable overall. Id. He had not taken any medication for over a month. Id. Plaintiff was calm and cooperative during the interview, was coherent but irritable, and his judgment and insight were fair with no suicidal ideations or thoughts. Id. at 1012. The plan was for Plaintiff to restart Effexor and Abilify for two weeks and increase the dose to see if it helped improve his irritability and then start therapy when possible. Id. Plaintiff was told to follow up in two weeks. Id.

Two weeks later, on January 18, 2023, Plaintiff told Dr. Gordon that he did not get his medication because he had misplaced the number of the pharmacy. Id. at 1006. He continued feeling irritable and depressed with a lower appetite. Id. Plaintiff also said he was getting into verbal altercations with others and "unfortunately" (his words) he could not work. Id. Plaintiff was not interested in therapy at the time, was given the number for the pharmacy, and was told to restart Effexor and Abilify with a dosage increase after two weeks. Id. at 1007. Three weeks later when he saw Dr. Gordon again, Plaintiff informed him he had stopped taking Effexor because he was having stomach side effects from the medication, and the side effects went away. Id. at 1089. He was also feeling better overall and had a "little bit of benefit" from Abilify. Id. The exam notes show Plaintiff was calm and cooperative throughout the interview, with appropriate rapport, euthymic mood, coherent speech, fair judgment and insight, with no suicidal or homicidal ideations. Id. at 1090. Plaintiff planned to start Zoloft and continue with Abilify. Id.

On February 22, 2023, Plaintiff said he was doing much better on Zoloft, with a better

overall mood, and was feeling "calm." Id. at 1095. He had no side effects from the medication. Id. Plaintiff was calm and cooperative throughout the interview with coherent speech, euthymic mood, and fair judgment and insight. Id. Per Plaintiff's preference, Dr. Gordon increased his dosage of Zoloft. Id. Plaintiff reported during the March 21, 2023 appointment with Dr. Gordon that "he was finally feeling calmer" and had not felt that way "since 1996." Id. at 1100. He "now ha[d] some peace of mind." Id. Plaintiff relayed that he still had some PTSD symptoms, but he could "work on healing himself." Id. Again, he was calm and cooperative, with appropriate rapport, euthymic mood, coherent speech, fair judgment and insight, with no suicidal ideations and thoughts. Id. At the May 17, 2023 appointment with Dr. Gordon, Plaintiff continued to express that he was doing well and he thought he would do better with a higher dose of Zoloft. Id. at 1105. He still had some depression and anxiety symptoms, but he described them as "manageable." Id. Once again, he was calm and cooperative during the interview. Id.

**B. Non-medical evidence**

Plaintiff's father completed two Third Party Function reports, one in May 2022 and January 2023. Id. at 32, 267-74, 300-09. In the May report, Plaintiff's father stated that Plaintiff never gets out of bed, but he can clean his own room and do laundry. Id. at 268-69. He can also walk, use public transportation, and shop for food. Id. at 270. Plaintiff reads, watches television, texts, talks to people on the phone, and emails. Id. at 271. His father said Plaintiff "has problems spending time with others" and cannot get along with anybody. Id. at 272. Plaintiff has a short attention span and is "not good" at following written instructions and authority figures. Id. at 272-73. The January 2023 report stated the Plaintiff cannot deal with others or supervision, he has nightmares and flashbacks, and "[g]ets into frequent arguments and altercations." Id. at 300, 305.

Plaintiff testified at the August 2023 hearing that he has not performed any work in the last

fifteen (15) years. Id. at 47. From the time he was eighteen (18) to twenty-two (22), Plaintiff worked at two telemarketing companies. Id. Otherwise, medical problems kept him from working. Id. at 48. Plaintiff has intermittent explosive disorder where he winds up on edge and snapping at his co-workers and supervisors. Id. Plaintiff also testified he has flashbacks and nightmares, which causes him in combination with his medication to get very little sleep. Id. He also reported getting into a "major" argument on the bus because of his PTSD. Id. at 49. Plaintiff rarely gets out of the house since he has been on probation but will go to the supermarket and wear his Bluetooth speaker to block people out. Id. at 50. He goes to social outings with his father because of his father's calming effect on him. Id. Plaintiff was taking Zoloft and Abilify at the time of the hearing and the dosages had been increased since he started taking those medications. Id. Plaintiff testified they "take the edge off to an extent as far as depression," but they do not help with the nightmares or flashbacks. Id. at 50-51. He also described his physical neck pain radiating to his left hip. Id. at 51. Plaintiff smokes cigarettes and watches television. Id. He does not drive. Id. He uses public transportation once a month for food shopping and described his own social activities as "nonexistent." Id. at 51-52. He rarely does chores around the house. Id. at 52.

When asked about his difficulties getting along with people, Plaintiff said he snaps when people sit too close or start cracking jokes or may wind up threatening them. Id. He also can have angry outbursts when people tell him what to do. Id. Other triggers include the pressure of having to communicate and loud noises. Id. at 53-54. Plaintiff described a problem with a "roomer" when he was living in shared housing. Id. The incident led to a fight during which Plaintiff cut the other person with a bottle, resulting in Plaintiff spending a year in prison. Id. at 52-53. Plaintiff first started having flashbacks when he was seventeen (17) based on domestic and family disturbances. Id. at 53. Plaintiff said he had nightmares every night, approximately five (5) to

seven (7) and they kept him up for three (3) hours. Id. at 54. Plaintiff reported handling stress "poorly." Id. at 54-55. Plaintiff cannot concentrate more than two hours, and that his long-term memory is better than his short tern memory. Id. at 55. Plaintiff has bouts of depression in eight-month periods and constantly has anxiety. Id. at 56.

At the time of the hearing, Plaintiff saw Dr. Gordon monthly at telehealth appointments. Id. at 57. Plaintiff said his mental health has always been more of an issue than his physical health. Id. at 58.

## V. DISCUSSION

### A. The ALJ properly assessed Dr. Gordon's opinion, and the RFC is supported by substantial evidence in the record.

Plaintiff first asserts that the RFC determination conflicts with Dr. Gordon's medical opinion. Doc. 14, at 4-10. Specifically, Plaintiff claims the ALJ did not sufficiently analyze the factors that must be considered when he evaluated Dr. Gordon's medical opinion. Id. at 7-10. Defendant argues the RFC is supported by substantial evidence in the record and as to the persuasiveness of Dr. Gordon's medical opinion. Doc. 15, at 7-12.

An RFC assessment is the most a claimant can do in a work setting despite the limitations his or her impairments cause. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC is based on all the relevant and other evidence in the case record. 20 C.F.R § 416.945(a)(3).

It is the ALJ's exclusive responsibility to determine the claimant's RFC. 20 C.F.R. § 416.946(c). The RFC assessment must be "'accompanied by a clear and satisfactory explication of the basis on which it rests.'" Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). This explanation must be sufficient for the reviewing court "to perform its statutory function of judicial review." Cotter, 642 F.2d at 704-05; Fargnoli, 247 F.3d at 42 ("Although we do not expect the ALJ to make

reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Nevertheless, the ALJ is not required to discuss or refer to every piece of relevant evidence in the record when assessing an RFC. Fargnoli, 247 F.3d at 42; Cotter v. Harris, 650 F.2d 481, 482 (3d Cir. 1981) (stating in decision denying panel rehearing that substantial evidence burden "simply requires that the ALJ indicate. . . he/she has considered all the evidence, both for and against the claim, and provide some explanation why he/she has rejected probative evidence which would have suggested a contrary disposition," that "no comprehensive explanation for rejection of evidence is required," and instead "a sentence or short paragraph would probably suffice"). Once an ALJ has made an RFC determination, the RFC will not be set aside provided substantial evidence supports it. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002).

The ALJ must evaluate the persuasiveness of each medical opinion based on five factors. See 20 C.F.R. §§ 404.1520c(c), 416.920c(c); Thomas v. Kijakazi, Civ. Act. No. 21-cv-3547, 2022 WL 17880922, at *6 (E.D. P.a. Dec. 22, 2022); see also Lawrence v. Comm'r of Soc. Sec., Civ. Act. No. 3:21-cv-01239, 2022 WL 17093943, at *4 (M.D. Pa. Nov. 21, 2022) ("Rather than assigning weight to medical opinions, [an ALJ] will articulate how persuasive he or she finds the medical opinions.") (alteration in original) (citations and internal quotations omitted). These factors include: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating relationship and the frequency of exams; (4) the medical source's specialization; and (5) other factors including but not limited to the source's familiarity with the other evidence in a claim or an understanding of the disability program's policy and evidentiary requirements. 20 C.F.R. § 416.920c(c).

When determining whether a medical opinion is persuasive, the most important factors are supportability and consistency. 20 C.F.R. § 416.920c(b)(2). While the ALJ is not required to explain all factors, the ALJ must explain how she considered supportability and consistency. Id. Supportability considers how relevant "the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)." 20 C.F.R. § 416.920c(c)(1). Meanwhile, consistency considers the measure of how consistent "a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 416.920c(c)(2). The ALJ need not explicitly mention the concepts of supportability or consistency when analyzing the factors. See e.g., Cooper v. Comm'r of Soc. Sec., 563 F. App'x. 904, 911 (3d Cir. 2014) (stating ALJ need not use certain "magic" words when conducting analysis so long as ALJ explains reasoning for determination such that Court can meaningfully review decision) (citation omitted).

Plaintiff challenges the ALJ's findings regarding the persuasiveness of Dr. Gordon's opinion of Plaintiff's mental impairments.[16] Doc. 14, at 8. The ALJ summarized Dr. Gordon's care of Plaintiff as follows:

> On January 18, 2023, [Dr. Gordon] reported that he initially evaluated the [Plaintiff] on November 22, 2022, and started him on medications. Dr. Gordon indicated that [Plaintiff] reported symptoms of anhedonia or pervasive lost of interest in almost all activities, appetite disturbances with weight change, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, mood disturbance, emotional lability, recurrent and intrusive recollections of a traumatic

[16] The four areas of mental functioning include understanding, remembering or applying information, interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing oneself. 20 C.F.R. § pt. 404, subpt. P, app. 1. To satisfy the paragraph B criteria, a claimant's mental disorder must result in an extreme limitation of one or marked limitations in two of the four areas of mental functioning. 20 C.F.R. § pt. 404, subpt. P, app. 1.

> experience that are a source of marked distress, persistent disturbances of mood or affect, and intense and unstable relationships and impulsive and damaging behavior. Dr. Gordon stated that the [Plaintiff] had marked limitation in his ability to remember work-like procedures, maintain attention for two-hour long segments, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting the[m] or exhibiting behavioral extremes, and deal with normal work stress. Dr. Gordon reported that [Plaintiff] had moderate restriction of activities of daily living and difficulties in maintaining concentration, persistence, or pace, marked difficulties in maintaining social functioning, and had three to four episodes of decompensation lasting at least two weeks in a 12-month period. He noted that [Plaintiff] would be less than 80% efficient compared with an average worker, would be unable to complete a workday four or more days per month, and would be absent four or more days per month.

R. 31 (internal citations omitted); <u>see also</u> 1074-76.

As to the persuasiveness of Dr. Gordon's opinion, the ALJ decided that:

> Dr. Gordon's assessment is not persuasive because it is inconsistent with his mental status examination findings during 2022/2023, and there is no discussion of [Plaintiff's] inconsistent medication compliance or lack of consistent individual therapy. Specifically, Dr. Gordon found that [Plaintiff] was cooperative and oriented times four with appropriate rapport, coherent speech, appropriate thought content and process, fair to good insight and judgment, and no suicidal or homicidal ideations. These findings . . . are not consistent with the extreme limitations imposed by Dr. Gordon. Additionally, as of January 2023, [Plaintiff] had been off his medications, had only been evaluated by Dr. Gordon less than a handful of times, and had not been recommended for a higher level of care due to his mental impairments.

R. 31 (internal citations omitted).

The ALJ sufficiently discussed why he did not find Dr. Gordon's medical opinion

persuasive and addressed the required factors of supportability and consistency. See 20 C.F.R. § 416.920c(b)(2); Cooper, 563 F. App'x. at 911; Cotter, 650 F.2d at 482. As to supportability, the ALJ compared Dr. Gordon's findings with Dr. Brown's own examination of Plaintiff. Specifically, the ALJ found that Dr. Gordon's finding of marked limitations[17] in Plaintiff's ability, among other things, to work with or near others without being distracting, to complete a normal workday/workweek without psychologically-based symptoms, to accept and respond appropriately to supervisors, to get along with coworkers/peers without unduly distracting them or exhibiting extreme behaviors, and to deal with normal work stress, was not in line with his Dr. Gordon's mental exams of Plaintiff throughout 2022 and 2023. R. 31. For example, during many of the exams with Dr. Gordon, Plaintiff was cooperative, oriented times four with good rapport, exhibited fair to good insight and judgment, related well, with appropriate thought content and process. R. 1012, 1016-17, 1090, 1095, 1100. Significantly, at his March 2023 exam, he admitted to "finally feeling calmer" and had not felt that way "since 1996." R. 1100. He also reported at that time "having peace of mind." Id. At his next appointment in May 2023, Plaintiff reported he continued to do well with some "manageable" depression and anxiety symptoms. Id. at 1105. He was again calm and cooperative during the appointment. Id. These findings of Dr. Gordon do not support the serious nature of a marked limitation.

As to consistency, the ALJ evaluated Dr. Gordon's assessment and opinion that Plaintiff

[17] For purposes of mental impairments, a marked limitation means claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § pt. 404, subpt. P., app. 1; Wright v. Comm'r of Soc. Sec., No. 19-cv-5131, 2020 WL 3958484, at *5 (D.N.J. July 13, 2020).

had marked limitations in several areas and the ALJ determined this opinion was less persuasive than other medical opinions, especially when considering the medical evidence in the record as a whole. See 20 C.F.R. § 416.920c(c)(2). The ALJ determined, in part, that Dr. Gordon did not address Plaintiff's irregularity and failure to attend therapy despite other doctors' recommendations, including Dr. Gordon's direction otherwise, and how that affected his proposed limitations. Id. at 31, 910, 914, 916-17, 919, 926, 928, 935-36, 938, 974, 978, 980-81, 983, 988, 990, 992, 995, 999, 1002; see also R. at 931 (showing Plaintiff stopped individual therapy sessions in July 2022); R. at 1007 (as of January 2023 Plaintiff not interested in therapy at time); R. 1012, 1017 (Dr. Gordon directing plaintiff at November 2022 and January 2023 appointment to start therapy).

Moreover, the ALJ noted in his explanation that Plaintiff often failed to take his medications for his mental impairments, against doctor's orders. Id. at 1011 (plaintiff had not taken medications in over a month as of January 4, 2023 appointment); R. 1006 (at time of January 18, 2023 appointment, Plaintiff reported misplacing pharmacy phone number and had still not obtained nor was taking recommended prescription medications); see also R. 50-51 (Plaintiff testified that Zoloft and Ability was helping with depression but not nightmares or flashbacks); R. 1089, 1095 (Plaintiff was feeling better when taking Abilify and Zoloft). The record indicates Plaintiff felt and functioned better when taking his medication. Id. at 1005, 1095, 1100. This factor weighed against the persuasiveness of Dr. Gordon's finding that Plaintiff had marked limitations. See, e.g., Dearth v. Barnhart, 34 F. App'x 874, 875 (3d Cir. 2002) (RFC was upheld when numerous doctors found claimant functioned reasonably well with psychiatric treatment including taking Paxil and claimant confirmed he felt "pretty good" taking it, in part, because "[i]f . . . symptom can be reasonably controlled by medication or treatment, it is not disabling.")

(additional citations omitted); Gamble v. Berryhill, No. 3:16-cv-01443, 2017 WL 4401650, at *9 (M.D. Pa. Sept. 19, 2017) (stating claimant's failure to follow doctor's treatment plan was significant "because controlling regulations provide that a claimant must follow prescribed treatment to restore ability to work," and if a condition "is amenable to treatment, it cannot serve as . . . basis for disability.") (citing 20 C.F.R. § 416.930); Young v. Colvin, No. 3:13-cv-00248, 2014 WL 4918325, at *16 (M.D. Pa. Sept. 30, 2014) (providing that Third Circuit recognizes medical conditions that can be reasonably controlled with medications and treatment "are not considered disabling.'") (citing 20 C.F.R. § 416.930; Brown v. Bowen, 845 F.3d 1211, 1215 (3d Cir. 1988)).

The ALJ found Dr. Gibbings' opinion and limitations persuasive because they were consistent with Plaintiff's subjective complaints, treatment history, and mental status evaluations. R. 31, 1011-12, 1033, 1037-38, 1046, 1051, 1063, 1079, 1084-85, 1089-90, 1095, 1100, 1105. The ALJ acknowledged that Plaintiff has "some symptoms and limitations," but the record did not fully support the severity of the symptoms as Plaintiff alleged. Id. at 32.

The ALJ sufficiently explained why Dr. Gordon's opinion about Plaintiff's serious limitations was not persuasive and imposed an appropriate RFC based on evidence in the record. See, e.g., Tracie O. v. Bisignano, Civ. Act. NO. 23-cv-1861, 2025 WL 2690308 at *9 (noting generally ALJ may choose to credit certain medical opinions over others provided evidence is not rejected "for no reason or for the wrong reason.") (quoting Mason v. Shala, 994 F.2d 1058, 1066 (3d Cir. 1993)). Substantial evidence in the record supports the RFC.[18] Accordingly,

[18] Plaintiff argues that an "adequate" and "articulated rationale" is missing and cites Vera R. v. Kijakazi, No. 3:20-cv-17465, 2022 WL 17959584, at *8 (D.N.J. Dec. 27, 2022) to argue the ALJ presented no explanation here. Doc. 14, at 10. Unlike this case, the Court remanded the case in Vera R. in part because the ALJ's only specific reasoning for rejecting the opinion of one of the doctors relied on a mischaracterization of the record. Id. In addition, the ALJ provided no analysis regarding supportability and consistency. Id. Thus, the Court found, for this and other reasons, remand was appropriate. Id. For these reasons, this case is easily distinguishable from Vera R.

Plaintiff's first claim fails.

**B. Substantial evidence in the record demonstrates there are jobs in the national economy that Plaintiff can perform, and therefore the Commissioner has met his burden at step five.**

Plaintiff's next claim is that the jobs in the national economy the VE testified he could perform are "obsolete" or there are not significant numbers in the national economy for them to meet the Commissioner's burden at step five. Doc. 14, at 11-15.

At step five, the Commissioner has the burden of proving that the claimant can perform other jobs in the local and national economies in light of their age, education, work experience, and RFC. See Poulos, 474 F.3d at 92. The Commissioner "meets this burden by showing that one or more jobs exist in substantial numbers in the national economy that plaintiff can perform." Lane v. Comm'r of Soc. Sec., 100 F. App'x 90, 97 (3d Cir. 2004) (citing 20 C.F.R. § 404.1566(b)). The ALJ needs to identify what jobs a claimant can perform with his limitations and whether those types of jobs exist in significant numbers in the national economy. Biestek, 587 U.S. at 100 (citations omitted). The VE aids in this finding, and a VE's testimony "constitutes substantial evidence for purposes of judicial review where the testimony is in response to proper hypothetical questions which fairly set out all of a claimant's impairments." Lane, 100 F. App'x at 97; Rutherford, 529 F.3d at 205 (stating ALJ often seeks advisory testimony from VE about other jobs that exist in significant numbers in national economy). If an adjustment to other work cannot be made, a claimant will be found to be disabled. 20 C.F.R. § 416.920(a)(4)(v).

"The Codes of Federal Regulations specifically lists the DOT [Dictionary of Occupations Titles ("DOT")] as a source of 'reliable job information.'" Michele C. v. Kijakazi, No. 21-cv-2051, 2022 WL 5242283, at *13 (D.N.J. Oct. 6, 2022) (quoting 20 C.F.R. § 404.1566(d)); see also

20 C.F.R. § 416.966(d)(1) (noting when determining if unskilled, sedentary, light and medium jobs exist in the national economy in significant numbers, Social Security Administration will take administrative notice of reliable job information from, inter alia, DOT). Additionally, the DOT is an appropriate source of occupational data. Michele C., 2022 WL 5242283, at *13 (quotations and citations omitted); see also Rush v. Berryhill, Civ. Act. No. 17-939, 2018 WL 4257930, at *1, n. 1 (W.D. Pa. Sept. 6, 2018) (courts in Third Circuit "continue to find the DOT to be an appropriate source of occupational information and have declined to require ALJs and VEs to consult other sources in addition to the DOT") (citations omitted).

Plaintiff first contends that one of the jobs the VE found Plaintiff could perform—a candy spreader[19]— is obsolete and the job does not exist in significant numbers in the national economy. Doc. 14, at 12-14. The VE found that with Plaintiff's RFC, at medium exertional level, the unskilled job of candy spreader had 40,000 jobs nationally based on the DOT. R. 33, 60. Plaintiff has not presented any evidence that the candy spreader job currently is obsolete—only his assertion it is so. Doc. 14, at 12-13. Even assuming the candy spreader job were obsolete, the VE identified two other jobs, furniture finisher and laundry laborer, which Plaintiff could perform with his RFC. R. 33, Doc. 15, at 13.

Additionally, the ALJ was permitted to accept the VE's reliance on the DOT regarding the number of jobs available in the national economy in the amounts of 40,000 (candy spreader),

---

[19] A candy spreader "[p]ours and spreads batches of cooked candy, such as fudge, caramel, or toffee, in pans or trays, or onto temperature-controlled slabs preparatory to cutting: Covers pan, tray, or slab with wax paper, dusts lined pan with powdered sugar, or greases with shortening to prevent sticking. Spreads candy to specified thickness, using spatula or roller. May cut candy into sections, using knife, for use by CUTTING-MACHINE OPERATOR (sugar & conf.) or set cutter frames into candy to slice it into individual sections. May roughen surface with scraper to simulate homemade candy or sprinkle chopped nuts or fruit over candy to decorate it. When spreading and cutting bar candy, may be designated Candy Maker, Bar (sugar & conf.)." DOT # 520.687-022.

70,000 (furniture finisher), and 75,000 (laundry laborer), respectively. See, e.g., Michele C., 2022 WL 5242283, at *13; Rush, 2018 WL 4257930, at *1 n.1. These amounts represent a significant number of jobs in the national economy. See, e.g., Sanchez v. Comm'r, 705 F. App'x 95, 99 (3d Cir. 2017) (finding precedent suggests 18,000 jobs in the national economy was sufficiently significant to support denial of benefits) (citation omitted); Young v. Astrue, 519 F. App'x 769. 772 (3d Cir. 2013) (testimony from VE that 20,000 jobs were available in national economy sufficient to support finding that work existed in significant numbers) (citations omitted); see also Ahmad v. Comm'r of Soc. Sec., 531 F. App'x 275, 278 (3d Cir. 2013) (concluding that ALJ did not err when finding 596 jobs as surveillance system monitor in regional Pennsylvania economy was "'clear indication' that other meaningful work in the national economy existed).[20] Therefore, Plaintiff's second claim is meritless.

[20] The VE also testified that Plaintiff could perform the light work jobs of night cleaner (DOT #323.687-014, 110,000 jobs nationally), tag inserter (DOT # 794.687-058 (35,000 jobs nationally), and fruit garnisher (DOT # 524.687-014 20,000 jobs nationally) with his restrictions. R. 60. In his brief, Plaintiff relies on Joseph M. v. Kijakazi, No. 1-21-cv-3815, 2023 WL 6212012, at *8 (D.N.J. Sept. 22, 2023) to argue that the SkillTRAN number of jobs (31 candy spreader jobs; 188 furniture finisher jobs; and 132 laundry laborer jobs) should be used instead of the DOT numbers. Doc. 14, at 13-14. Joseph M. is distinguishable, however, because even though the Plaintiff raised the SkillTRAN job issue at the administrative hearing in that case, the ALJ did not permit Plaintiff's counsel to pursue this line of inquiry. Id. Here, Plaintiff could have objected or questioned the VE about the reliability of DOT numbers at the hearing but did not. As previously noted, Plaintiff's own assertion that the VE's testimony was unreliable is insufficient to find substantial evidence does not support this ruling. See Lane, 100 F. App'x at 97; Rutherford, 529 F.3d at 205.

## VI. CONCLUSION

Substantial evidence supports the ALJ's findings regarding Dr. Gordon. Additionally, the Commissioner has met its burden of proof at step five. Accordingly, Plaintiff's request for review (Doc. 1) is **DENIED**. An appropriate order accompanies this opinion.

BY THE COURT:

/s/ Craig M. Straw
CRAIG M. STRAW
U.S. Magistrate Judge